**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| T.W., a minor, | ) |
| By his parent and next friend, | ) |
| Ms. Dorothy Watson | ) |
| 1926 Rosedale Street, N.E. | ) |
| Washington D.C.  20002 | ) |
| | ) |
| and | ) |
| | ) |
| T.W. | ) |
| 1926 Rosedale Street, N.E. | ) |
| Washington, D.C. 20002 | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| DISTRICT OF COLUMBIA, | ) |
| A Municipal Corporation, | ) |
| One Judiciary Square | ) |
| 441 4th St., N.W. | ) |
| Washington, D.C.  20001, | ) |
| | ) |
| and | ) |
| | ) |
| Ms. Michelle Rhee, | ) |
| DCPS Chancellor | ) |
| District of Columbia Public Schools | ) |
| 825 North Capitol St., N.E. | ) |
| Washington, D.C.  20002 | ) |
| (In her official capacity) | ) |
| | ) |
| Defendants. | ) |

**PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

Plaintiffs Dorothy Watson and T.W. respectfully request that the Court issue an

Order pursuant to Rule 65 of the Federal Rules of Civil Procedure, (a) Granting judgment

for Plaintiffs and against Defendants; (b) Granting declaratory relief that Defendants

violated Plaintiffs' rights under applicable law; (c) Granting injunctive relief ordering

Defendants to immediately place and fund T.W. at The Children's Guild with all necessary special education and related services, including transportation services; (d) Awarding attorneys' fees in this matter; and (e) Granting Plaintiffs any other relief this Court deems just and proper.

In support of this motion, Plaintiffs respectfully refer the Court to the attached Memorandum of Points and Authorities.

Respectfully submitted,

_____
Aaron J. Fischer, Esq.
D.C. Bar No. pending (admitted 9/10/07)
*Pro Bono* Counsel for Ms. Watson
The Children's Law Center
616 H St., NW, Suite 300
Washington, D.C. 20001
202-467-4900 ext. 525
Fax: 202-552-7125
afischer@childrenslawcenter.org

_____
Tracy L. Goodman, Esq.
D.C. Bar No. 481088
*Pro Bono* Counsel for Ms. Watson
The Children's Law Center
616 H St., NW, Suite 300
Washington, DC 20001
202-467-4900, ext. 503
Fax: 202-467-4949
tgoodman@childrenslawcenter.org

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| T.W., a minor, | ) |
| By his parent and next friend, | ) |
| Ms. Dorothy Watson | ) |
| 1926 Rosedale Street, N.E. | ) |
| Washington D.C.  20002 | ) |
| | ) |
| and | ) |
| | ) |
| T.W. | ) |
| 1926 Rosedale Street, N.E. | ) |
| Washington, D.C. 20002 | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| DISTRICT OF COLUMBIA, | ) |
| A Municipal Corporation, | ) |
| One Judiciary Square | ) |
| 441 4th St., N.W. | ) |
| Washington, D.C.  20001, | ) |
| | ) |
| and | ) |
| | ) |
| Ms. Michelle Rhee, DCPS Chancellor | ) |
| District of Columbia Public Schools | ) |
| 825 North Capitol St., N.E. | ) |
| Washington, D.C.  20002 | ) |
| (In her official capacity) | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

Immediate injunctive relief is necessary in this case to prevent irreparable injury

to a disabled child and to ensure that his right to a free and appropriate public education

("FAPE") is honored.  The Individuals with Disabilities Education Act ("IDEIA")

3

establishes this right to a FAPE and seeks to ensure that the rights of disabled children and their parents are protected. 20 U.S.C. § 1400 *et seq.* (2007). The District of Columbia Public Schools ("DCPS") violated and continues to violate T.W.'s rights by not providing him with a FAPE. Equally alarming, DCPS is failing to provide T.W. with an appropriate school placement with the supervision, support and structure necessary to maintain T.W.'s safety and well being, given his special needs. The result has been perpetual academic failure and, most urgently, increasingly life-threatening situations at school.

DCPS must be ordered to comply with federal and local law and provide T.W. with a FAPE without delay. Ms. Watson requests that this Court find that DCPS is denying T.W. a FAPE and therefore must provide him with the education to which he is entitled. Specifically, Ms. Watson requests that this Court order Defendants to immediately place and fund T.W. at The Children's Guild, with transportation services to be provided, along with all necessary special education and related services. This relief will appropriately implement the special education program and placement T.W. requires pursuant to extensive evidence and, in fact, the IEP DCPS created for him, which documents that a "full time therapeutic setting" is necessary to meet T.W.'s needs. As presented below, the standards for the issuance of a preliminary injunction and temporary restraining order are met in this case.

## I.  Factual Background

T.W., a resident of the District of Columbia, is a seven year old boy with a learning disability and extensive emotional needs. T.W.'s disability classification is learning disabled. Currently, T.W. is in a highly unsafe, untenable, and inappropriate

school environment.  DCPS is denying T.W. a FAPE by not providing him with an

appropriate Individualized Educational Program ("IEP"), adequate supervision,

appropriate levels and quality of specialized instruction, essential special education

supports and related services, and an appropriate school placement.  Moreover, DCPS is

jeopardizing T.W.'s health and safety.  Most recently, T.W. was allowed to roam the

school building unsupervised.  He went to the school's restroom with a box of matches,

lighting several rolls of toilet paper on fire.  This highly dangerous incident led to the

evacuation of the school building and significant damage to the restroom.  The lives,

safety, and well being of T.W. and his peers were put at considerable risk in the process.

*See* Exhibits P-1; P-2.

This incident arises in the wake of repeated instances in which DCPS has failed to

ensure T.W.'s safety – resulting in other dangerous situations posed by T.W.'s climbing

on school installations, throwing of furniture, and leaving the classroom without

permission or supervision.  *See* Exhibit P-1.  Further, DCPS is failing to afford T.W. the

opportunity to make educational progress as required by the law.  As such, T.W.'s great-

grandmother and legal guardian, Ms. Watson seeks an appropriate placement that can

provide T.W. with a safe environment as well as an appropriate setting in which to obtain

educational benefit without further delay.

**History of Denial of FAPE**

T.W. is currently a second grade student at Gibbs Elementary School ("Gibbs

E.S."), where he began attending in the 2005-2006 school year.  *See* Exhibits P-1; P-3.

As a Kindergarten and first grade student, T.W. struggled consistently with his academic

program, and T.W.'s teachers expressed concerns about T.W.'s difficulties on numerous

occasions.  *Id.*  Nonetheless, DCPS failed to take timely and appropriate action in response to T.W.'s academic difficulties.  *See* Exhibit P-4.

T.W.'s special needs were evident at a very young age.  When T.W. was four years old, an MDT/IEP team found him eligible for special education, providing him with 30 hours/week of specialized instruction, with a full-time placement at National Children's Center.  *See* Exhibit P-5.  His classification was "Developmental Delay."  *Id.* Yet on August 4, 2005, just one year after being placed in a full-time special education program, DCPS terminated T.W.'s eligibility for special education services and exited T.W. from special education entirely.  *See* Exhibit P-6.  Instead of continuing to provide full-time, intensive special education services, DCPS placed T.W. in a regular education Kindergarten classroom at Gibbs E.S.  *See* Exhibits P-1; P-3; P-4.  Subsequently, his substantial special needs went unmet, resulting in little to no educational progress and recurring behavioral problems reflective of his ADHD diagnosis as well as his frustration and depression relating to his academic deficits and failures.  *See* Exhibits P-1; P-3; P-4; P-7; P-8.

As a Kindergarten student at Gibbs Elementary School during the 2005-2006 school year, T.W. immediately and repeatedly demonstrated the severity and extent of his special needs, including impaired social/emotional functioning as well as considerable learning deficits.  In October 2005, his teacher reported that T.W.'s behavior was "aggressive" and marked by his "refusal to participate" in classroom lessons and activities.  *See* Exhibit P-3.  In January 2006, his teacher noted that T.W. is "easily distracted and his task performance is low," while "his reaction to being redirected is to demonstrate a tantrum."  *Id.*  She explicitly asserted that "additional support is needed"

for T.W, noting that T.W. "ignores verbal directions," "crawls on the floor," "refuses to participate in group activities," "demonstrates periods of being in a trance-like state," and shows "limited work production." *See* Exhibit P-7. In June 2006, she wrote that T.W. "becomes overstimulated in large groups" and "performs better in small groups." *See* Exhibit P-3. In spite of these reports, DCPS failed to identify T.W. as a student with special needs, to evaluate him, and to provide him with an appropriate educational placement and program during the 2005-06 school year.

During the 2006-2007 school year, T.W. continued to display academic difficulties and significant behavioral problems. T.W. struggled consistently on all first grade academic work. He would not do the reading or math assignments provided by the regular education teacher. *See* Exhibit P-8. T.W.'s behavior also deteriorated and became increasingly alarming: he frequently hid under the classroom tables, moved chairs, left the classroom on his own and entirely unsupervised, and even climbed on bathroom stalls, radiators, or tables. *See* Exhibits P-1; P-4. These major threats to T.W.'s safety combined with T.W.'s lack of educational progress highlight his need for a full-time special education placement that can serve both his learning disabilities and social/emotional needs. T.W. requires a full-time special education placement that provides a small, self-contained learning environment with a low student-to-teacher ratio, a behavior intervention plan, counseling and support services, special education materials, and a program with an effective behavioral management component. *See* Exhibits P-9; P-10. Additionally, T.W. requires individualized instructional strategies across content areas, which include multi-modality instruction, scaffold skills, opportunities for guided practice, and self-monitoring strategies to promote application

and generalization of acquired skills.  *See* Exhibit P-10.  He also requires individualized

opportunities for social processing in order to problem-solve social challenges and to

acquire and apply self-regulating strategies.  *See id.*

On December 21, 2006, Ms. Watson requested an immediate referral for special

education evaluations.  An initial MDT meeting was convened on January 30, 2007.

During the meeting, the regular education teacher reported that T.W. would do work only

when he was taken out of the regular education classroom and placed in a considerably

smaller setting, generally one with the school social worker or special education teacher.

*See* Exhibit P-8.  In February 2007, the DCPS psychologist conducted a psycho-

educational evaluation, in which he identified T.W.'s significant learning deficits.  *See*

Exhibit P-9.  The evaluation report identifies that T.W.'s reading and math skills are in

the "Borderline" range, and that his "related skills . . . are extremely low."  *Id.*  The

DCPS psychologist also identified impaired social/emotional functioning – including

having trouble staying seated, being overly active, acting impulsively, and being easily

distracted – that is "interfering with his learning process" and requires "considerably

more attention than it is getting" in his present placement.  *Id.*

Meanwhile, T.W.'s teachers and other school staff continued to observe and

report significant concerns about his special needs and the inappropriateness of his

present placement.  In February 2007, in response to unsafe behavior at school –

including but not limited to moving classroom furniture, climbing school installations,

and roaming the school unsupervised – that was a manifestation of T.W.'s special needs

and disabilities, the school suspended T.W. for ten days.  Ms. Watson's legal counsel

contacted the school by letter to clarify that this ten-day suspension, along with the many

class exclusions earlier in the year, would be a violation of the IDEIA. *See* Exhibit P-11;
20 U.S.C. § 1415(k)(1). T.W. ultimately served two days of this suspension before
DCPS allowed him to return to school.

On March 22, 2007, T.W.'s multi-disciplinary team convened and found T.W.
eligible for special education as a student with the disability classification of learning
disabled ("LD"). *See* Exhibits P-9; P-12. The team also determined that a large
classroom with numerous students is not appropriate for T.W. given his academic and
social/emotional issues, including his LD and ADHD diagnoses. The DCPS psycho-
educational evaluation report recommended that T.W. be placed in a "different physical
placement … i.e., either a different classroom where the opportunities for distraction are
much less, or a different school where the opportunities for distraction are much less." *In
fact, the IEP itself states that the General Education Classroom cannot meet his service
needs, as it will effect "continued school failure," and that the Combination General
Education Classroom and Resource Room will not meet his service needs, as it will effect
"continued conflicts with peers." The IEP documents that a "full time therapeutic
setting" is necessary to meet T.W.'s needs.* *See* Exhibit P-12. However, DCPS failed to
provide such a placement, instead placing T.W. in a part-time program that provides only
sixteen hours of specialized instruction and related services at Gibbs E.S. *See* Exhibits P-
1; P-12.

Meanwhile, T.W. has continued in this unsafe, inappropriate, and harmful
placement and program, resulting in ongoing educational failure and further damaging
incidents. During T.W.'s Extended School Year (ESY) program at Miner Elementary
School in June and July, 2007, the program's social worker documented that T.W. did not

demonstrate progress on multiple articulated goals.  She noted that T.W. "was not on task

nor did he participate in any classroom instruction assignments."  *See* Exhibit P-13. She

further noted that when T.W. was unable to succeed in a classroom activity in which he

demonstrated some effort, he "regressed quickly: Hiding under the table, angry."  *Id.*  An

ESY classroom aide reported at the conclusion of the summer program that T.W. had

made little to no educational progress and refused to do any of his academic work.  *See*

Exhibit P-1.  The program's coordinator indicated to Ms. Watson that T.W. requires a

full-time therapeutic setting.  *See id.*

**Ongoing Denial of FAPE and Threat to T.W.'s Safety under Present Circumstances**

To date, DCPS has not provided T.W. with the appropriate special education and

related services that he requires, and T.W. has therefore been unable to make educational

progress.  Moreover, T.W.'s safety and well being is in serious jeopardy at Gibbs E.S.,

highlighted by the recent highly dangerous situation involving T.W.'s unsupervised use

of matches and "arsenal [sic] combustion" inside the school building.  *See* Exhibit P-2.

On September 5, 2007, Gibbs ES staff allowed T.W. to wander out of his

classroom on his own.  T.W. proceeded to the restroom with a box of matches.  Once in

the restroom, he lit several matches, igniting rolls of toilet paper in each bathroom stall

and according to the school's report, causing "arsenal [sic] combustion."  *See* Exhibits P-

1; P-2.  Thankfully, another child entered the restroom and, observing the smell and sight

of fire, reported the situation to school staff.  *Id.*  The student body was evacuated from

the school building.  *See* Exhibit P-1.  While T.W. was eventually removed from the

restroom without suffering physical harm, the restroom itself was significantly damaged

due to the fire.  *Id.*  Subsequent to this highly dangerous incident, DCPS took no steps to

provide T.W. with an appropriate special education program and placement that would serve his needs and ensure his safety moving forward. *Id.* Instead, the school removed T.W. from his class for a three-day in-school suspension, having him sit in the special education coordinator's office on his own, receiving no educational services of instruction at all. The school also imposed an eight-day suspension – to begin September 14, 2007 – that does nothing to provide T.W. with a more appropriate education, instead exacerbating his academic failures as well as his frustrations, anger, and emotional deficits by denying him any educational services at all. *See* Exhibits P-1; P-2.

Due to DCPS's failures to address T.W.'s learning disabilities and impaired social-emotional functioning, T.W. is neither in a safe school setting nor in a setting in which he is available for learning and able to learn. He frequently acts out in the classroom and even leaves the classroom on his own. Further, when T.W. is in class, he is emotionally unavailable for learning, as he is hyperactive, impulsive, disruptive and unable to cope with the frustrations and stresses of being in a classroom that cannot serve his considerable learning disabilities and social/emotional needs. It has become readily apparent that ensuring safety and educational progress in T.W.'s current placement is simply impossible. He requires a full-time special education placement at The Children's Guild in order to obtain a FAPE. *See* Exhibit P-10. Still, DCPS has continued to insist that Gibbs E.S. remain T.W.'s educational placement.

**The Due Process Complaint and Further DCPS Violations**

Due to DCPS's refusal to serve T.W.'s special needs by providing FAPE through a full-time and appropriate placement, Ms. Watson filed a due process complaint with the DCPS State Education Agency Special Education Student Hearing Officer ("Student

Hearing Office") on August 1, 2007.[1]  *See* Exhibit P-3.  The due process complaint requested placement for T.W. at The Children's Guild, with transportation services to be provided, as well as compensatory education services to compensate T.W. for the time during which he was denied a FAPE, for the period beginning with DCPS's action of exiting T.W. from special education entirely on August 4, 2005 and continuing to the present.  *See id.*

In response to the due process complaint filed by Ms. Watson, the Student Hearing Office issued a Scheduling Memorandum to both parties on August 6, 2007.  *See* Exhibit P-14.  The Scheduling Memorandum required DCPS to provide a response to the complaint no later than August 11, 2007 and convene a resolution session no later than August 16, 2007, in conformity with the statutory timelines of the IDEIA.  *Id.*  DCPS failed to comply with any of the deadlines in this order, and failed in all of its responsibilities under the IDEIA in regards to required due process procedures.  *See* Exhibits P-1; P-4; P-15.

DCPS failed to provide a written response or prior written notice to Petitioner for nineteen (19) days – almost twice the legal maximum – and when it did issue a response on August 20, 2007, it failed to comply with the explicit legal requirements for that

---

[1] The Due Process Complaint alleges that DCPS failed to provide T.W. with a FAPE.  The particular issues included: (1) DCPS's action to inappropriately exit T.W. from special education on August 4, 2005; (2) DCPS's failure to timely identify, locate, and/or appropriately evaluate T.W. for special education eligibility; (3) DCPS's failure to create an appropriate Individualized Education Plan for T.W. to address his special education needs; (4) DCPS's failure to provide T.W. an appropriate educational placement to address his unique special needs; (5) DCPS's wrongful exclusion of T.W. from class for more than ten days without conducting a manifestation meeting to determine whether the demonstrated behaviors are related to T.W.'s disability; (6) DCPS's failure to create and implement an appropriate and/or timely Behavior Intervention Plan for T.W.; (7) DCPS's failure to include all necessary members of the MDT/IEP team in the IEP development process; and (8) DCPS's failure to convene and/or conduct appropriate and/or timely MDT/IEP meetings.  *See* Exhibit P-3.

response.  *See* 20 U.S.C. § 1415 (c)(2)(B); Exhibits P-15; P-16.  The response was

written by the special education coordinator at Gibbs E.S., not the Office of General

Counsel.  *See* Exhibit P-16.  The special education coordinator acknowledged that he

"cannot answer to why or when the process of the SST was delayed or never done" and

made no mention of the disputed IEP and placement.  *Id.*  While this extremely brief

response makes reference to some individual issues relating to the due process complaint,

it does not provide an explanation of why the agency proposed or refused to take the

actions raised by Ms. Watson, making no reference to the evaluations, records, and other

factors that were relevant to DCPS's proposed or refused actions.  *Id.*  The core issues of

the due process complaint, asserting that (1) T.W. requires a full-time special education

placement that can serve his extensive learning deficits and social/emotional needs, (2)

DCPS inappropriately exited T.W. from full-time special education program, and (3)

DCPS continues to deny a FAPE, go fundamentally unaddressed in DCPS's response.  *Id.*

Meanwhile, DCPS failed to hold the legally required resolution session at all, as required

by the IDEIA and the scheduling order.  *See* 20 U.S.C. § 1415(f)(1)(B); *see also* Exhibits

P-1; P-14.

     Ms. Watson filed a Motion for Default with the Student Hearing Office on August

28, 2007, serving a copy of that Motion on DCPS's Office of General Counsel.  *See*

Exhibit P-17.  DCPS has provided no response to this Motion, and the Student Hearing

Office has issued no decision.  The Student Hearing Office informed the petitioner of this

Motion by phone that no decision would be issued until the due process hearing was

scheduled, at which point a Hearing Officer would be assigned.  Ms. Watson remains

without timely recourse for the multiple and ongoing violations by DCPS and their harmful impact on T.W.'s education, safety, and well being.

**Remedy Sought for the Ongoing Denial of FAPE and Threat to T.W.'s Safety**

As requested in the due process complaint, Ms. Watson seeks placement for T.W. at The Children's Guild in Chillum, Maryland, an appropriate school for T.W. to which he has been accepted. *See* Exhibits P-18; P-19. Ellie Giles, an expert in special who has been an educational consultant for fifteen (15) years and has professional certification in teaching, administration, and special education, has considerable knowledge about T.W.'s profile and needs; she has declared that T.W. requires a placement at The Children's Guild, which will be able to address his emotional needs as well as his academic needs. *See* Exhibit P-10. The Children's Guild is a therapeutic full-time, special education school that serves children with emotional, behavioral, and learning needs. *See* Exhibit P-19. LaMar Williams, the Admissions Director at The Children's Guild has reviewed T.W.'s educational records and met with him and Ms. Watson; she has determined that The Children's Guild can serve T.W.'s extensive special needs. *See* Exhibit P-19.

The special education and support services outlined in T.W.'s IEP can be provided on campus by the staff at The Children's Guild. *See* Exhibit P-10. The Children's Guild provides a low student-staff ratio, with two certified special education teachers and a therapist assigned to a classroom of no more than twelve (12) students. *See* Exhibit P-19. If placed at the The Children's Guild, T.W. will have a therapist who will be available whenever needed throughout the school day. *See id.* T.W.'s therapist will also be an integral part of the teaching team and will work closely with T.W. both in

the classroom and through counseling services pursuant to his IEP.  *See id*.  In addition,

the students at The Children's Guild have access to a multi-sensory de-escalation room

outside of the classroom that provides a safe and supervised space in which students can

safely regroup and regain composure if necessary.  *See id.*  The Children's Guild is an

appropriate school placement for T.W. that can provide him a FAPE; if placed there,

T.W. will at long last have an opportunity to make educational progress.  *See* Exhibit P-

10.

      However, T.W. could lose his spot if he is not placed at The Children's Guild

immediately, as the school has limited availability for new students and cannot guarantee

a spot for T.W. indefinitely.  *See* Exhibit P-19.  There is no doubt that T.W. requires

immediate placement at The Children's Guild.  To date, DCPS has failed both to comply

with the procedural requirements of the IDEIA as well as to create and implement an

appropriate IEP for T.W. and to provide him with an appropriate special education

program and placement.  Given this set of circumstances, Ms. Watson seeks immediate

injunctive relief to prevent irreparable harm to T.W.

## II. Parent is Entitled to Injunctive Relief Under the Traditional Four-Prong Test

      Ms. Watson and T.W. are entitled to injunctive relief to ensure that the provisions

of IDEIA are enforced so as to guarantee that T.W. can receive the FAPE to which T.W.

is entitled.  The traditional standards for injunctive relief are set forth in *Virginia*

*Petroleum Jobbers Ass'n v. Federal Power Commission*, 259 F.2d 921, 925 (D.C. Cir.

1958).  *See also Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.,* 559

F.2d 841, 843 (D.C. Cir. 1977).  In order to be granted injunctive relief, a plaintiff must

show that: (1) it is likely to prevail on the merits of the appeal; (2) without the relief

requested it will suffer irreparable injury; (3) the issuance of the injunction would not substantially harm other interested parties; and (4) the public interest lies with the granting of the injunction.  This four-prong test is the standard applicable to a request for injunctive relief under IDEIA.  *See Massey v. District of Columbia*, 400 F. Supp. 2d 66 (D.D.C. 2005).  Ms. Watson and T.W. meet all four prongs of this test, and therefore are entitled to injunctive relief.

### A.  Ms. Watson Has Demonstrated a Likelihood of Success on the Merits.

**1.  There is a substantial likelihood that Ms. Watson will prevail on the merits of her claim that DCPS is denying T.W. a free and appropriate public education in violation of the IDEIA.**

Ms. Watson is substantially likely to prevail on the merits of her claim because DCPS is failing to provide T.W. the free and appropriate public education (FAPE) to which he is entitled under the IDEIA.  20 U.S.C. § 1412(a)(1)(A) ("A free appropriate public education is available to all children with disabilities … between the ages of 3 and 21…").  A FAPE is defined in part as special education and related services that have been provided at public expense in conformity with a child's IEP.  20 U.S.C. § 1401(9).  The Supreme Court has clarified that school districts provide a disabled child a FAPE by ensuring that he or she has access to specialized instruction and related services that are individually designed to confer some educational benefit upon the child.  *Bd. Of Educ. v. Rowley*, 458 U.S. 176, 188-89 (1982).  To receive educational benefit, T.W. requires specialized instruction and counseling services in a full-time therapeutic special education program like that provided at The Children's Guild.  However, DCPS has failed in its obligation to provide T.W. with a FAPE for more than two years.

Despite T.W.'s clear academic and behavioral needs, DCPS inappropriately and inexplicably removed him from his full-time special education program on August 4, 2005.  *See* Exhibit P-6.  During the 2005-2006 school year and nearly the entire 2006-2007 school year, no special education services at all were provided to T.W.  *See* Exhibits P-1; P-4.  The IDEIA requires that DCPS identify, locate, and evaluate all children in need of special education in the District of Columbia.  20 U.S.C. § 1412(a)(3)(A). Nonetheless, once T.W. was exited from special education and placed at Gibbs E.S. – where he consistently demonstrated serious learning deficits and behavioral problems – DCPS did not provide T.W. with evaluations for special education or take additional steps to provide him with the services and accommodations he needs.  T.W. was therefore deprived of a FAPE; his intensive special needs went entirely unaddressed and unmet.

During the current school year, 2007-2008, DCPS continues to deny T.W. a FAPE.  The IDEIA requires that an IEP be developed and in effect for all children with disabilities who qualify for special education.  20 U.S.C. § 1412(a)(4); 1414(d)(1)(A); § 1414(d)(2)(A).  An IEP was developed for T.W. on May 9, 2007, but this IEP is inappropriate and insufficient to meet T.W.'s needs, and the documented need for a full-time therapeutic setting is not being implemented.  *See* Exhibits P-10; P-12.  It provides an insufficient special education program that is far short of the full-time, therapeutic special education program he needs in order to receive a FAPE.  The IEP team – including the DCPS psychologist and special education coordinator – agreed that T.W. requires specialized instruction in a small, self-contained special education setting.  *See* Exhibits P-1; P-12.  Gibbs E.S. has only one special education teacher for all of its

students, and the special education coordinator has stated that the school's special education program functions based on the inclusion model. *See* Exhibit P-1. Inclusion in the general education setting is not appropriate for T.W., as he requires full-time specialized instruction in a self-contained setting. *See* Exhibit P-10. Furthermore, the special education classroom at Gibbs E.S. itself is entirely insufficient given T.W.'s special needs, as it regularly contains more than twenty students from different grades. *See* Exhibit P-1. T.W. requires a far more intensive therapeutic special education placement that can provide a smaller, more supportive educational setting. Neither the placement presently provided at Gibbs E.S. nor placement at any other DCPS school can provide T.W. with a FAPE given his special needs. Accordingly, T.W. must be placed in a full-time therapeutic special education placement like The Children's Guild, where his special needs will be appropriately served. There is no doubt that Ms. Watson will prevail on the merits because of DCPS's failure to create and implement an IEP that can provide T.W. with an appropriate educational program and placement. This flagrant violation of the IDEIA continues to preclude educational benefit for T.W. and, equally significant, to endanger T.W. and his classmates at Gibbs E.S.[2]

   **2.    There is a substantial likelihood of success on the merits because the remedy sought by Ms. Watson is appropriate.**

   Ms. Watson is substantially likely to receive the requested remedy of placement at The Children's Guild because DCPS failed to provide T.W. with any appropriate

---

[2] Though Ms. Watson's likelihood of success on the merits is obvious and substantial, it is not necessary that she demonstrate "a mathematical probability" that she will succeed on the merits. *Cox v. Brown,* 498 F. Supp 823, 828 (D.D.C. 1980). Rather, in IDEIA cases, the Court "must weigh the irreparability of harm, and if it is substantial, the Court may, in its discretion, grant relief even though its view of the merits may markedly differ from that of the plaintiffs." *Id.* (citing *Washington Metropolitan Area Transit Commission*, 559 F.2d at 843-44). Although Ms. Watson will undoubtedly prevail on the merits, given that DCPS's failures have resulted in the absolute denial of an appropriate school placement for T.W., the irreparable harm to T.W. is substantial such that this prong would nonetheless be satisfied.

placement and The Children's Guild is an appropriate school placement for T.W. Furthermore, no other remedy is appropriate in this case.  If the school system does not provide a child with a FAPE, private placement is proper if the education provided by the private school placement is "reasonably calculated to enable the child to receive educational benefits."  *Wirta v. District of Columbia,* 859 F. Supp. 1, 4 (D.D.C. 1994), citing *Rowley*, 458 U.S. at 176.  Ms. Watson seeks placement for her son at The Children's Guild, which has accepted T.W.  *See* Exhibit P-18.  As a full-time therapeutic special education school that serves children with special emotional, behavioral, and learning needs, and that can provide T.W. with all of the supports, services, and accommodations he requires, The Children's Guild is an appropriate special education placement for T.W.  *See* Exhibits P-10; P-19.

Importantly, DCPS cannot be given another opportunity to fail this child when it has repeatedly denied T.W. the education that is his right for more than two years now. *Wirta*, 859 F. Supp. at 5 (D.D.C. 1994). ("There is [n]o authority which permits a school system a second opportunity to conduct evaluations and propose an alternative placement where its failure to do so in the first instance violated the requirements of the Act."). DCPS failed to provide T.W. with a FAPE during his first two years as a student at Gibbs E.S., and DCPS continues to deny T.W. with a FAPE during this school year, effecting what has become an increasingly unsafe and untenable situation.  DCPS had the opportunity (and in fact the legal duty) to respond to Ms. Watson's concerns as outlined in the due process complaint and to convene a resolution session to resolve those concerns, but it failed to do so.

Subsequent to the highly dangerous incident involving the restroom fire on September 5, 2007, DCPS took no steps towards providing T.W. with an appropriate special education program and placement, instead suspending him from school for eight (8) days.  *See* Exhibit P-2.  Because DCPS has so patently and repeatedly denied T.W. a FAPE, it should not have additional opportunities to propose a placement for T.W., all at the expense of T.W.'s safety, well being, and education.  It is clear that The Children's Guild can provide T.W. with a FAPE and that T.W. will finally have an opportunity to make academic progress if placed there.  Consequently, Ms. Watson is likely to prevail in seeking placement at The Children's Guild for T.W. as an appropriate remedy.

**B.  Irreparable Harm Will Result Absent Injunctive Relief**

    **1.      DCPS's denial of FAPE to T.W. will continue to cause T.W.
            irreparable harm.**

T.W. will continue to suffer irreparable harm at the hands of DCPS if the injunctive relief requested herein is not granted.  This Court previously determined that a school district's failure to place a student in an appropriate school, thereby denying a FAPE, constitutes irreparable injury:

> It appears that absent injunctive relief, [the students] will suffer the irreparable harm of lacking each day of their young lives an appropriate education, one that is sensitive to their particular disabilities, commensurate to their levels of understanding, and fulfilling of their immediate needs.

*Cox,* 498 F. Supp. at 829.

DCPS has failed to provide T.W. with an appropriate education since the time he was exited from his full-time special education placement in August 2005 and demonstrated educational deficits in the 2005-2006 school year.  Depriving a child of even one day of an appropriate education is sufficient to find irreparable harm.  *Blackman*

*v. District of Columbia*, 277 F. Supp. 2d 71, 79 (D.D.C. 2003), citing *Cox,* 498 F. Supp. at 828.  Having gone more than two years without an appropriate education, the harm to T.W. has accumulated: he has spiraled to the point in which he engages in behavior dangerous to himself and others; he has suffered intensely from academic frustration, low self-esteem, and depression; and he has consistently achieved below grade level.  *See* Exhibits P-1; P-2; P-3; P-7; P-8; P-9; P-10.  Due to DCPS's repeated failures, T.W.'s deficits have only intensified, and he now immediately requires a full-time therapeutic special education placement.

Despite T.W.'s obvious need for special education services and a new placement, DCPS is failing to act and ignoring the many needs of this very young and fragile child. Time is of the essence in providing T.W. with the necessary special education placement and services so that further irreversible harm will not result.  *See Blackman v. District of Columbia,* 185 F.R.D. 4, 7 (D.D.C. 1999) ("[T]o a young, growing person, time is critical.  While a few months in the life of an adult may be insignificant, at the rate at which a child develops and changes, especially one at the onset of biological adolescence with or without the special needs like those of our plaintiff, a few months can make a world of difference in the life of that child."); *see also Watson v. District of Columbia*, 522 F. Supp. 1102, 1111 (D.D.C. 1981) ("A month lost in the life of a child is forever lost, an 'eternity,' while which type of education she should have received passes back and forth through examination and evaluation.").

Even after the incident of the fire in the school building, DCPS has responded only by suspending T.W. for as long as it can without constituting a legal change in placement.  *See* Exhibit P-2; s*ee* 20 U.S.C. § 1415(k); 34 C.F.R. § 300.536.  This course

of action does nothing to address the underlying failure of serving T.W.'s clear special needs by keeping him at an inappropriate school placement.  T.W. is likely to return from any suspension equally or more frustrated, disengaged, and prone to unsafe behaviors. This Court has recognized that a child without disabilities would suffer harm from being unable to attend school, but that "such harm is heightened for a disabled child with much greater need for daily structure and consistency."  *Massey*, 400 F. Supp. at 74.  The exclusion from the classroom as well as the formal suspension from school will contribute to the irreparable harm suffered, as T.W. will be denied all education services, including the specialized instruction and related services he requires.  This irreversible harm to T.W. becomes more serious the longer T.W. remains without an appropriate educational placement.

> **2.    T.W. will continue to suffer irreparable harm because Ms. Watson is financially unable to place T.W. at The Children's Guild and seek reimbursement thereafter.**

Where a school district fails to provide a child with FAPE, the Supreme Court has provided parents with the right to receive reimbursement for placing their children in private school placements.  *School Comm. of the Town of Burlington, Mass v. Dept. of Educ. of Mass.*, 471 U.S. 359, 369 (1985).  Congress subsequently codified this right in the IDEIA.  *See* 20 U.S.C.A. §1412(a)(10)(c).  If Ms. Watson had the financial means, she could have personally funded T.W. at The Children's Guild and subsequently sought reimbursement from DCPS.  Surely, in providing parents with this right, Congress did not intend to deny parents without adequate financial means a similar, immediate remedy when the circumstances demand it.  Without the financial means, Ms. Watson has no choice but to seek immediate injunctive relief in order for T.W. to have an opportunity to

attend school and benefit from his education.[3]   Because DCPS is causing irreparable

harm to T.W. and Ms. Watson is unable to fund T.W. at The Children's Guild on her own

and seek reimbursement later, the harm to T.W. will only continue to compound without

immediate judicial relief.

> **3.    T.W. will continue to suffer irreparable harm because there is no assurance that DCPS will abide by the procedural requirements of the IDEIA.**

This Court has recognized that where a child has not been provided with a FAPE

and there is no assurance that DCPS is able to follow the procedural timelines required by

the IDEIA, the child will suffer irreparable harm if the injunction is not granted.  *Massey,*

400 F. Supp. at 74.  Here, because DCPS has repeatedly failed to follow the procedural

responsibilities and timelines required by the IDEIA, there is no telling how long T.W.

will remain without a FAPE.  DCPS has failed to follow the procedural guidelines in

regards to evaluating and identifying T.W. as a child in need of special education, to

address Ms. Watson's concerns about T.W.'s placement, to respond appropriately and

timely to Ms. Watson's complaint, to convene a resolution session following the filing of

her due process complaint, and to respond to Ms. Watson's Motion for Default Judgment.

T.W. should not be forced to continue to suffer harm while uncertainty about his

education persists due to DCPS's disregard for the procedural requirements of the law.

When Ms. Watson pursued a due process hearing request against DCPS, the

school district failed in its procedural responsibilities.  The IDEIA requires that DCPS

---

[3] Ms. Watson's inability to place T.W. at The Children's Guild and later seek reimbursement is especially concerning, as The Children's Guild is unable to hold a spot for T.W. given the protracted due process timelines.  *See* Exhibit P-19.  The potentially limited availability of space for T.W. at The Children's Guild highlights the urgent need for a resolution that that will provide an appropriate placement and provides additional justification for the granting of a preliminary injunction to prevent further irreparable harm to T.W.

respond to a due process hearing request in writing within ten days, providing Ms. Watson with: (1) an explanation of why the school district refused to take the actions raised in the complaint, (2) a description of other options that were considered and the reasons why those options were rejected, (3) a description of the evaluation, procedure, assessment, record or report the school district used as the basis for the refused action, and (4) a description of the factors that are relevant to the school district's refusal. *See* 20 U.S.C. § 1415(c)(2)(B). Here, DCPS failed to provide Ms. Watson with a timely written response within ten days of receiving the due process hearing request, and its overdue written response was wholly insufficient: it was drafted by the school's special education coordinator and was devoid of any discussion regarding the core issues of the complaint. *See* Exhibit P-16.

The IDEIA also requires that DCPS convene a resolution session within fifteen days of receiving notice of the parent's complaint to provide the parent with an opportunity to discuss the complaint and the school district an opportunity to resolve the complaint. 20 U.S.C. § 1415(f)(1)(B)(i). Here, not only did DCPS fail to timely convene a resolution session within the first fifteen days after the filing of the complaint, DCPS failed altogether to convene a resolution session. *See* Exhibits P-1; P-15. Moreover, when Ms. Watson filed a Motion for Default Judgment based on DCPS's failure to timely and appropriately provide a written response or convene a resolution session, DCPS failed to respond to this Motion as well. *See* Exhibits P-15; P-17. In short, DCPS has denied Ms. Watson any opportunity to resolve her complaints and enforce her rights time and again.

The IDEIA clarifies that procedural violations can amount to a finding of a denial of FAPE where the procedural inadequacies impeded the child's right to a FAPE or caused a deprivation of educational benefit, or where the procedural violations significantly impeded the parent's opportunity to participate in the decision-making process regarding the provision of FAPE.  20 U.S.C. §1415(f)(3)(E)(ii).  Here, these results contemplated by the IDEIA as amounting to the denial of a FAPE are present.  First, DCPS's procedural violations have impeded T.W.'s right to FAPE and deprived him of any educational benefit.  T.W. continues to go without the special education he requires and presently is receiving no educational services of any kind due to the class exclusion and suspension.  Second, Ms. Watson has been impeded from the decision-making process regarding T.W.'s education, as her concerns through the IEP process were not addressed and her efforts to work with DCPS to resolve her complaint have gone effectively unanswered.  *See Schaffer v. Weast*, 546 U.S. 49, 61 (2005) (asserting Congress' intent under IDEIA to require due process that "guarantees parents and children the procedural protections" that are in fact essential to the protection of the law's substantive rights themselves).

Even if the procedural violations were not found by this Court to amount to a denial of FAPE, it is well established that courts may order injunctive relief based on no more than the failure to comply with IDEIA procedural safeguards.  *See Blackman,* 277 F. Supp. 2d (granting injunctive relief based on DCPS's failure to timely convene due process hearings).  Here, DCPS has failed to fulfill multiple procedural obligations to Ms. Watson and her disabled son, undermining what the Supreme Court has identified as the "core" of the IDEIA's legal protections.  *See Schaffer*, 546 U.S. at 53, 61 (finding that

"the core of the statute . . . is the cooperative process that it establishes between parents and schools" and asserting the importance that the statute, "in fact, requires state authorities to organize hearings in a way that guarantees parents and children the procedural protections of the Act")  Ms. Watson has attempted to avail herself of the administrative process, but DCPS did not engage with Ms. Watson in this process as required by law, leading to irreparable injury to T.W.   T.W. is suffering tremendously as a student at Gibbs E.S. without the therapeutic, behavioral, and academic supports he needs.  Moreover, T.W. will continue to suffer with each passing day he goes without a safe and appropriate educational setting.  A preliminary injunction is immediately required in order to prevent any further irreparable harm to T.W caused by DCPS's multiple and ongoing substantive and procedural violations.

    **C.**    **There is No harm to DCPS if T.W. is Placed and Funded at The Children's Guild.**

DCPS will suffer no harm if the motion for injunctive relief is granted.  DCPS is obligated under federal and local law to provide disabled children with a FAPE; it has continually failed to do so in the present case.  The law specifically allows for parents to place their children in private schools when the school system has failed to provide a FAPE to their child. 20 U.S.C. § 1415(f)(1)(B); D.C. Mun. Regs. Tit. 5, § 3018.3 (2003). As discussed above in Section II(A)(2), if the school system does not provide a child with a FAPE, private placement is proper if the education provided by the private school placement is "reasonably calculated to enable the child to receive educational benefits." *Wirta*, 859 F. Supp. at 4, *citing Rowley*, 458 U.S. at 176.  Moreover, the law requires DCPS to place a child in a private school where DCPS cannot provide an appropriate

public school placement for the child.  D.C. Mun. Regs. Tit. 5 § 3012; 3013.  To order DCPS to comply with the law creates no harm.

The only impact that the granting of this preliminary injunction could possibly have upon DCPS is budgetary.  This Court has recognized that granting a preliminary injunction that requires a school district to bear a financial expense in providing FAPE does not amount to hardship for the school district because Congress has squarely placed this obligation on the school district:

> Congress [has] determined that [the school district] must provide an appropriate educational program for each of its pupils.  When [the school district] is not to be in compliance with that congressional mandate, as suggested above, then an individualized program, albeit involving expense, must be produced to fulfill not the obvious compassionate necessities for these children but to uphold the congressional intent of devising that which purports to satisfy equal protection.

*Cox,* 498 F. Supp. at 830.

DCPS must fulfill its obligations and provide T.W. with a FAPE, regardless of any financial expense it will incur.  It is within DCPS's control to comply with the IDEIA and obviate the need for courts to order relief that will impact the school district's budget.  *See Massey,* 400 F. Supp. at 74.  The remedy of private placement is appropriate and the financial cost to DCPS is minimal in comparison to the continued irreparable emotional, psychological, and academic harm T.W. will suffer if relief is denied.

### D.  The Public Interest Will Be Served by Granting the Injunctive Relief Requested.

Finally, the public interest is best served by granting the injunctive relief requested.  In accordance with IDEIA and local laws, the school system is required to provide children with disabilities a FAPE.  Here, DCPS has utterly failed in its responsibilities.  Granting the relief requested by Ms. Watson ensures that T.W. will

finally get the special education and related services to which he is entitled under the law. Prior decisions by this Court have explicitly stated that the relevant public interest is that of students with special needs. "'The public interest lies in the proper enforcement of … the IDEA and in securing the due process rights of special education students and their parents provided by statute.' Furthermore, that public interest 'outweighs any asserted financial harm to DCPS.'" *Massey,* 400 F. Supp. at 75, quoting *Petties v. District of Columbia,* 238 F. Supp. 2d 88, 99 (D.D.C. 2002). The public interest is furthered when the government adheres to the law and enforces its most vulnerable citizens' statutory rights. The public interest will be served if T.W. is placed and funded at The Children's Guild, where he can begin receiving educational benefit after more than two years in an unsafe, untenable, and inappropriate educational setting.

**III. Placement of T.W. at The Children's Guild is the Appropriate Relief**

Judicial officers have the authority in IDEIA cases to issue any remedy necessary to ensure that a child receives the FAPE to which he or she is entitled. *See Harris v. District of Columbia,* 1992 U.S. Dist. LEXIS 11831, 13-14 (D.D.C. 1992). T.W. immediately requires the remedy requested, placement at The Children's Guild with transportation services to be provided, in order to ensure he receives a FAPE. DCPS's administrative process will not prevent the immediate irreparable harm suffered by T.W., and nothing short of a preliminary injunction or temporary restraining order will ensure that T.W. receives a FAPE. At this time, T.W. cannot safely attend school because his current school, Gibbs E.S., is inappropriate and cannot provide the supervision, accommodations, and services necessary to ensure his safety. Just as important, T.W. will continue to be denied the educational benefit to which he is legally entitled and that

is necessary for him to make academic progress.  The irreparable injury he is enduring is only compounding with each day he remains without an appropriate placement.  T.W. cannot continue to wait on the administrative process to address his urgent need for an appropriate school placement; an immediate and appropriate resolution is of critical importance.

This Court has held that "a well recognized exception to the exhaustion requirement, in an instance where irreparable harm may accrue, satisfies the failure to pursue administrative remedies." *Cox,* 498 F. Supp. at 829.  The administrative remedy in this matter is the issuance of a hearing officer's determination following a due process hearing, which is not required until seventy-five days after the due process complaint is received.  20 U.S.C. §1415(f)(B)(ii); D.C. Mun. Regs. Tit. 5 § 3030.1(d).  Thus, if T.W. is forced to pursue DCPS's administrative process, T.W. will face the denial of FAPE for approximately thirty additional days and possibly even more if DCPS continues to fail in its obligations under the IDEIA; the irreparable harm to T.W. – made clear by his ongoing academic failures and literally incendiary threats to his safety and well being – would only continue to accrue. Only a preliminary injunction or temporary restraining order requiring that DCPS place and fund T.W. at The Children's Guild will ensure that T.W. receives a FAPE and effectively prevent T.W. from accruing additional injury.[4]

DCPS failed and continues to fail on a daily basis to provide T.W. with a FAPE. DCPS acted inappropriately and illegally when it removed T.W. entirely from his special education program and placement in August 2005.  Since then, DCPS has failed to create

---

[4] When Ms. Watson filed for her complaint for a due process hearing, she sought placement for T.W. at The Children's Guild, with transportation services to be provided, and compensatory education services for the period of time T.W. was denied a FAPE.  Outside T.W.'s immediate need for an appropriate placement, Ms. Watson reserves the right to pursue administrative remedies for any compensatory education services, if these issues still remain outstanding if and when T.W. is placed at The Children's Guild.

and implement an appropriate IEP that includes an appropriate placement and special education program for him.  When a school system fails in its duty to provide a child with FAPE, a private school placement is "proper under the Act" if the education provided by the private school is "reasonably calculated to enable the child to receive educational benefits."  *Wirta,* 895 F. Supp. at 4.  As outlined above, at The Children's Guild will provide T.W. full-time specialized instruction as well as the therapeutic, supportive, structured environment and counseling he requires in order to obtain a FAPE.  T.W. and Ms. Watson must not be made to wait indefinitely, as T.W. languishes academically and faces greater dangers similar to or even worse than the nearly explosive incident on September 5, 2007 that stemmed from his wholly inappropriate program and placement. T.W. will begin receiving a FAPE as soon as he begins attending The Children's Guild. Without this remedy, T.W., who has already been denied a FAPE for over two years, will continue to suffer in his emotional, behavioral and academic development.

**IV.    Rule LCvR 7(m) Statement**

On September 17, 2007, undersigned counsel spoke via telephone with Robert Utiger, Esq. counsel for Defendant, in a good faith effort to discuss this motion and determine whether there is any opposition to the relief sought.  The parties were unable to agree to any resolution.  Robert Utiger, Esq expressed that Defendants could not agree to the relief sought herein at this time.

**V.  Conclusion**.

For the foregoing reasons mentioned in this Memorandum, Ms. Watson satisfies the four-prong test for injunctive relief.  Therefore, Ms. Watson respectfully requests that this Court grant her Motion and order Defendants to immediately place and fund T.W. at

The Children's Guild, with transportation to be provided, along with all necessary special

education and related services.

Respectfully submitted,

_____
Aaron J. Fischer, Esq.
D.C. Bar No. pending (admitted 9/10/07)
*Pro Bono* Counsel for Ms. Watson
The Children's Law Center
616 H Street, NW, Suite 300
Washington, DC 20001
202-467-4900, ext. 525
Fax: 202-552-7125
afischer@childrenslawcenter.org

_____
Tracy L. Goodman, Esq.
D.C. Bar No. 481088
Counsel for Ms. Watson
The Children's Law Center
616 H Street, NW – Suite 300
Washington DC, 20001
(202) 467-4900, X 503
(202) 467-4949 (fax)
tgoodman@childrenslawcenter.org

<u>Certification Pursuant to LCvR 83.2(g) and LCvR 83.2(j)</u>

I, Aaron J. Fischer, undersigned counsel, hereby certify that I am providing legal representation without compensation for Plaintiff, Dorothy Watson, in this matter, and that I am a member in good standing of the District of Columbia Bar.  Furthermore, I hereby certify that I have personal familiarity with the Local Rules for United States District Court for the District of Columbia.

I certify under penalty of perjury that the foregoing is true and correct.  Executed on September 19, 2007.

_____
Aaron J. Fischer, Esq.
D.C. Bar No. pending (admitted 9/10/07)
*Pro Bono* Counsel for Ms. Watson
The Children's Law Center
616 H Street, NW, Suite 300
Washington, DC 20001
202-467-4900, ext. 525
Fax: 202-552-7125
Afischer@childrenslawcenter.org

<u>Certification Pursuant to LCvR 83.2(g) and LCvR 83.2(j)</u>

I, Tracy L. Goodman, undersigned counsel, hereby certify that I am providing legal representation without compensation for Plaintiff, T.W. Watson, in this matter, and that I am a member in good standing of the District of Columbia Bar.  Furthermore, I hereby certify that I have personal familiarity with the Local Rules for United States District Court for the District of Columbia.

I certify under penalty of perjury that the foregoing is true and correct.  Executed on September 19, 2007.

_____
Tracy L. Goodman, Esq.
D.C. Bar No. 481088
Counsel for Ms. Watson
The Children's Law Center
616 H Street, NW – Suite 300
Washington DC, 20001
(202) 467-4900, X 503
(202) 467-4949 (fax)
tgoodman@childrenslawcenter.org